**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles THORN, Defendant–Appellant.**

**No. 89–7101.**

United States Court of Appeals,
Fifth Circuit.

Oct. 31, 1990.

Rehearing Denied Nov. 28, 1990.

John H. Hagler, Michael P. Carnes, Dallas, Tex., for defendant-appellant.

Delonia A. Watson, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before POLITZ, WILLIAMS, and SMITH, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Appellant Charles Thorn, with Ronnie Whitfield and J.E. "Sonny" Jamison, was charged with conspiracy to commit mail fraud and equity skimming in violation of 18 U.S.C. § 371; mail fraud in violation of 18 U.S.C. § 1341; equity skimming in violation of 12 U.S.C. § 1709–2; and aiding and abetting equity skimming and mail fraud in violation of 18 U.S.C. § 2. Thorn had his trial severed from the other two men charged in the indictment. Thorn was found guilty of the conspiracy count, six

counts of aiding and abetting mail fraud, and one count of aiding and abetting equity skimming. The judge sentenced Thorn to five years for conspiracy and three years for aiding and abetting equity skimming, with the sentences to run consecutively. The judge also fined Thorn $6,000 for the mail fraud counts, and ordered him to pay the Veterans' Administration $50,000 in restitution.

Appellant asserts that the evidence was insufficient to support the jury's verdict. He also claims that the district judge erred by excluding evidence of a state court indictment pending against a key prosecution witness. We affirm. The evidence in the record is sufficient to support Thorn's conviction on each of the charges. We also find no error in the district judge's ruling excluding evidence of the state court indictment pending against a prosecution witness.

## I. Background

The case arose in the west Texas town of Abilene, a community dependent upon oil, ranching, and the military for its economic well-being. Dropping oil prices in the mid–1980's predictably had a devastating effect on Abilene. One victim of the stagnant economy was the housing market. Homeowners attempting to move from the city found few buyers for their properties and often had to accept offers far below their original asking price. To sell their houses, many homeowners permitted buyers to assume the non-qualifying mortgages on their houses without paying any equity.

Three persons were involved in the alleged criminal scheme. Appellant, Charles Thorn, was a real estate broker and part owner of an Abilene real estate firm known as Martha Thorn Century 21 Realtors. Ronnie Whitfield was an entrepreneur involved in real estate management and other investments. J.E. "Sonny" Jamison was an unemployed truck driver. Sometime in the early spring of 1986 Thorn became associated with Jamison and Whitfield. The government charges that this association led to the equity skimming scheme that was the basis of Thorn's conviction.

Equity skimming is defined in 12 U.S.C. § 1709–2 as the practice of purchasing family dwellings subject to a loan guaranteed by the Veterans' Administration and subsequently applying some or all of the rental proceeds from these houses to personal gain rather than toward payment of the mortgage. The government offered evidence to prove that Thorn, Jamison, and Whitfield concocted a scheme to purchase houses in Abilene by assuming the mortgages, leasing the properties, collecting monthly rents, and converting the rental receipts to their personal use rather than to meeting the mortgage obligations. The mail fraud charges arose out of the collection by mail of the rents involved.

The government's evidence sought to show that Whitfield approached Jamison and asked him to act as nominal owner of the houses. At the time, Jamison was unemployed and had no assets. The plan was that Whitfield would rent and manage the properties, and Jamison would endorse all rental checks over to an account controlled by Whitfield. In return for his role in taking title, Whitfield agreed to pay Jamison ten percent of the rental receipts. The evidence showed that Thorn was present at this meeting.

Thorn acted as Jamison's agent to facilitate the purchase of the houses. Because the Abilene housing market was depressed, Jamison was able to acquire 17 houses by assuming the mortgages without any equity payments. In each of these assumptions the sellers also agreed to pay the closing costs and the real estate brokers' commissions. Thus, Whitfield, through Jamison, obtained 17 houses without spending any money. Thorn's firm received commissions ranging from $250 to $1000 on each of these assumptions.

The government also offered testimony that during negotiations with sellers, Thorn represented Jamison as the head of a group of investors from Fort Worth. Thorn told sellers and realtors that Jamison planned to lease the houses until the market turned around and the houses could be sold at a profit. Though the current rentals fell short of meeting the payments under the

mortgages, Thorn assured the sellers that Jamison and his group of investors could withstand a substantial negative cash flow for a significant period of time.[1]

These representations form the basis for the government's charges against Thorn. The government offered proof that Thorn was present during the early meetings between Jamison and Whitfield, and that he knew that Jamison had no means of satisfying the mortgage payments on the houses. Thorn's representations about Jamison's ability to finance a negative cash flow justifies the inference that Thorn actively participated in the equity skimming scheme.

Although they collected monthly rent on the houses, Jamison and Whitfield defaulted on the mortgage payments. All but one of the seventeen houses went into foreclosure.[2] The Veterans' Administration had to pay approximately $190,000 pursuant to its guarantee of the mortgages.

## II. *Sufficiency of the Evidence*

Thorn first contends that the evidence is insufficient to support the jury's verdict. In reviewing the sufficiency of the evidence, we view the evidence and any inferences that may be drawn from it in the light most favorable to the verdict. *United States v. Onick,* 889 F.2d 1425, 1428 (5th Cir.1990). Our review does not encompass weighing the evidence or judging the credibility of witnesses. *United States v. Davis,* 752 F.2d 963, 968 (5th Cir.1985). We must affirm the conviction if a rational jury could have found the essential elements of the crimes beyond a reasonable doubt. *United States v. Fortna,* 796 F.2d 724, 740 (5th Cir.), *cert. denied,* 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986).

## A. The Conspiracy Count

To prove Thorn guilty of conspiracy, 18 U.S.C. § 371 requires the government to prove beyond a reasonable doubt: (1) an agreement between two or more persons, one of whom was Thorn, (2) to commit a crime against the United States, and (3) an overt act committed by one of the conspirators in furtherance of the agreement. *United States v. Schmick,* 904 F.2d 936, 941 (5th Cir.1990). The government had to prove that a conspiracy existed, that Thorn knew of the conspiracy and that he voluntarily became a part of it. *United States v. Yamin,* 868 F.2d 130, 133 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 3258, 106 L.Ed.2d 603 (1989). If Thorn understood the unlawful nature of the activity and knowingly or intentionally joined it on at least one occasion, that was sufficient to convict him of conspiracy, even though he played only a minor role in the scheme. *United States v. Gonzales,* 866 F.2d 781, 787–88 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 2438, 104 L.Ed.2d 994 (1989). Circumstantial evidence is sufficient to prove the existence of a conspiracy. An agreement may be inferred from concert of action among the alleged participants, and voluntary participation may be inferred from a collocation of circumstances. *United States v. Espinoza–Seanez,* 862 F.2d 526, 537 (5th Cir. 1988).

The substantive crimes upon which the conspiracy count was based were equity skimming and mail fraud. The equity skimming statute mandates criminal penalties for "[w]hoever, with intent to defraud, willfully engages in a pattern or practice of (1) purchasing one- to four-family dwellings ... which are ... in default within one year subsequent to the purchase and the loan is ... guaranteed by the Veterans' Administration, or the loan is made by the Veterans' Administration, (2) failing to

---

**1.** As an example, if each of the 17 houses rented at $200 a month below the mortgage payment amount, Jamison had to sustain a monthly negative cash flow of $3400. The evidence indicates that Thorn was instructed to purchase houses with a maximum negative cash flow of $200 a month.

**2.** The original seller of one of the houses paid the arrearage to keep the lender from foreclosing.

make payments under the mortgage or deed of trust as the payments become due, regardless of whether the purchaser is obligated on the loan, and (3) applying or authorizing the application of rents from such dwellings for his own use...." 12 U.S.C. § 1709-2. The essential elements of mail fraud, under 18 U.S.C. § 1341, are: (1) a scheme to defraud, (2) involving the use of the mail, (3) for the purpose of executing the scheme. *United States v. Gordon*, 780 F.2d 1165, 1170 (5th Cir.1986). We find the evidence sufficient to support Thorn's conviction for conspiracy to commit crimes under both of these statutes.

Thorn does not deny the existence of an equity skimming scheme, or that the mails were used to further that scheme. The undisputed facts show that Jamison assumed the mortgages on 17 houses in Abilene. The mortgage on each of these houses was guaranteed by the Veterans' Administration. The houses were then leased, but the rental proceeds were not used to pay the mortgages.[3] It is also undisputed that some of the leases required the renters to make their monthly payments by mail.

Thorn argues that assuming the scheme existed, he was not part of the conspiracy and had no knowledge of it. Thorn offered evidence at trial to · show that he acted merely as a real estate agent. He claimed that his involvement with Jamison and Whitfield did not extend beyond the relationship between a real estate broker and his clients. He contends that he did nothing illegal by making offers on houses for Jamison, or by collecting commissions after the sales had been consummated.

The government, however, offered evidence showing that Thorn played a key role in the scheme. He was not acting merely as a real estate agent. The contradictory testimony presented by both sides shows that either Thorn or the government witnesses were lying. The jury obviously chose to believe the government's witnesses and the additional government evidence.

The evidence presented by the government was clearly sufficient to prove beyond a reasonable doubt the elements of conspiracy to commit equity skimming and mail fraud and Thorn's participation in the activity.

The government's evidence showed that Thorn was present at the meeting when Whitfield first asked Jamison to act as nominal owner of houses with mortgages guaranteed by the Veterans' Administration. The evidence also showed that Thorn acted as realtor for the purchase of all 17 houses, and that he collected commissions ranging from $250 to $1000 for each house. Several government witnesses testified that Thorn represented that Jamison was the head of a group of investors from Fort Worth capable of sustaining a negative cash flow on the houses for a significant period of time. He made these representations even though other evidence showed that he knew they were false. Evidence also indicates that Thorn played an active role in the leasing and management of the houses. In fact, Thorn was authorized to sign checks on the account into which Whitfield deposited the rent checks from the houses.

From this evidence, the jury properly could have inferred both Thorn's knowledge and voluntary participation in the scheme. By agreeing to act as Jamison's realtor when he knew that Jamison had no money to invest, Thorn voluntarily joined the conspiracy. Even more persuasive as to his participation in the conspiracy is the evidence that he knowingly misrepresented Jamison's credentials to sellers and realtors. Other evidence also can be taken to prove that Thorn actively discouraged the sellers from doing any kind of credit check on Jamison.

■ The conspiracy to commit mail fraud charge follows from Thorn's agreement to participate in an equity skimming scheme that required some lessees to mail their rent checks to Jamison. A conspirator is responsible for the offenses commit-

---

3. A total of only four payments combined were made toward the mortgages on the 17 houses. The government's evidence indicates that the only reason payments were made in these four instances was to facilitate closing the purchase on a particular house.

ted by his fellow conspirators if the conspirator was a member of the conspiracy when the offense was committed and the offense was committed in furtherance of or as a foreseeable consequence of the scheme. *United States v. Paul*, 853 F.2d 308, 312–13 (5th Cir.1988), *cert. denied*, 488 U.S. 1012, 109 S.Ct. 801, 102 L.Ed.2d 792 (1989). The jury's findings on the conspiracy charge are affirmed in all respects.

**B. Equity Skimming and Mail Fraud**

The indictment also charged Thorn with mail fraud, equity skimming, and aiding and abetting mail fraud and equity skimming. The jury found Thorn guilty of six counts of aiding and abetting mail fraud and one count of aiding and abetting equity skimming. Thorn challenges his conviction on all seven counts, again alleging that the evidence is insufficient to support the jury's verdict.

▆▆▆▆ Thorn was charged with substantive counts of aiding and abetting the substantive offenses. Aiding and abetting the commission of the offense is treated exactly the same under the statutory wording as the actual commission of the offense. To prove aiding and abetting, 18 U.S.C. § 2 required the government to show that Thorn (1) associated with a criminal venture, (2) participated in the venture, and (3) sought by his action to make the venture succeed. *United States v. Medina*, 887 F.2d 528, 532 (5th Cir.1989). The government had to establish that Thorn willfully participated in the criminal venture by engaging in some affirmative conduct designed to aid the scheme. *United States v. Ortiz–Loya*, 777 F.2d 973, 981 (5th Cir. 1985).

We find the evidence sufficient to support the jury verdict on all counts. Thorn associated with the criminal venture when he agreed to act as realtor for Jamison, a party he knew did not have the resources to purchase the 17 properties. He facilitated the purchase of these properties knowing that the rental proceeds would not be sufficient to service the mortgages, and that Jamison could not finance the difference. He participated in the venture and

sought to make it succeed by misrepresenting Jamison's credentials to various sellers and realtors. The jury could infer the requisite intent to defraud the government from this evidence and find Thorn guilty of aiding and abetting equity skimming.

The mail fraud charge stems from the requirement in some of the leases that the rental payments be sent by mail to Jamison. The government offered evidence to show that renters made six rent payments by mail. Because he knew or reasonably could foresee that some of the rental payments would be made by mail, Thorn possessed the requisite criminal intent to subject himself to liability for aiding and abetting mail fraud. *See Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954).

**III. *Exclusion of Evidence of State Court Indictment***

▆▆▆▆ The district judge refused to permit Thorn to introduce evidence of a state court indictment pending against Jamison, the government's key witness. Jamison was under indictment in the 259th District Court of Jones County, Texas for possession of more than 400 grams of a controlled substance. Thorn wished to introduce this evidence to show motive or bias on the part of Jamison to testify in favor of the government. On appeal he claims that the exclusion of this evidence violated his Sixth Amendment right of confrontation. Because we find that the district judge did not abuse his discretion by excluding this evidence, we reject Thorn's claim.

▆▆▆▆ The Federal Rules of Evidence severely restrict the use of extrinsic evidence to attack the character of a witness. Rule 608(b), however, does allow inquiry into acts other than convictions on cross-examination if probative of the witness' credibility. *See United States v. Abadie*, 879 F.2d 1260, 1267 (5th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 569, 107 L.Ed.2d 563 (1989). Extrinsic evidence of specific acts of conduct generally is not admissible to attack a witness' responses to this inquiry. Fed.R.Evid. 608(b).

An exception to the prohibition against the use of extrinsic evidence to attack the credibility of a witness exists in cases in which the evidence tends to show bias or motive for the witness to testify untruthfully. *United States v. Diecidue*, 603 F.2d 535, 550 (5th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980). Within limits the party challenging the witness is allowed to pursue relevant lines of inquiry aimed at discovering bias. *United States v. Hall*, 653 F.2d 1002, 1008 (5th Cir.1981). Admission of evidence under Rule 608(b) or its bias exception is in the sound discretion of the district court.

Thorn sought to question Jamison concerning the state court indictment and also to offer the indictment in evidence. The district court refused both requests. We review the district judge's ruling on the abuse of discretion standard. *United States v. Crumley*, 565 F.2d 945, 949 (5th Cir.1978). Under the general mandate of Rule 403, a district judge should exclude evidence if its prejudicial effect outweighs its probative value. The district judge explicitly held that admission of evidence that Jamison faced serious state drug possession charges would have a highly prejudicial effect on the way the jury viewed his testimony.

Thorn surmises that the pending state court indictment gave Jamison a motive to testify favorably for the government with the hope that he might receive some leniency as to his state charges. In *United States v. Abadie*, 879 F.2d 1260 (5th Cir. 1989), we discussed the admissibility of state court indictments in a federal prosecution to show the bias of a witness. *Abadie* dealt specifically with a *Brady* challenge to the failure of the government to disclose a state court indictment pending against one of its witnesses. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We determined that there was no *Brady* violation because the defendant failed to show that the evidence of the state court indictment would have been admissible in the federal proceedings. *Abadie*, 879 F.2d at 1267. We observed that the defendant had made no showing that the federal prosecutor had any ability to influence the disposition of the state

indictment. Like the defendant in *Abadie*, Thorn has failed to offer any evidence that the government could influence the disposition of the state court proceedings. The existence of a pending state court indictment on charges totally unrelated to the testimony offered in the equity skimming case was not shown to give Jamison a substantial reason to cooperate with the federal prosecution.

The trial judge's ruling prevented Thorn from asking specific questions about the state court indictment. Nothing in the record indicates that the judge would have prevented Thorn from questioning Jamison in general terms about the existence of a deal with the prosecution affecting his testimony in the equity skimming case. In his closing argument, Thorn asked the jury to consider the possibility of a deal between the witness and the prosecution but without any evidence of such a deal in the record. In aid of Thorn's concerns, the judge did instruct the jury to consider the testimony of Jamison, an accomplice, with caution. The jury knew that Jamison faced the same charges as Thorn. The jury also heard evidence that Jamison had a poor reputation for truthfulness. Thorn's alleged purpose for wanting this evidence admitted was to bring Jamison's credibility into question. Certainly that message was conveyed to the jury.

We find that the district judge properly acted in his discretion in determining that the prejudicial effect of allowing the jury to hear about the state court indictment outweighed its probative value.

### IV.  *Conclusion*

We conclude that substantial evidence supported Thorn's conviction on all counts and that the district court did not err in rejecting the admissibility of evidence that a major prosecution witness was under indictment in a state court for a wholly unrelated offense. We affirm the judgment of the district court in all respects.

AFFIRMED.